## STATE LIFE INS. CO. v. SPENCER. *
### No. 6678.

Circuit Court of Appeals, Fifth Circuit.
Jan. 20, 1933.

*Rehearing*Rehearing denied February 20, 1933.

Mark McMahon, of Ft. Worth, Tex., and Milton W. Mangus, of Indianapolis, Ind., for appellant.

R. F. Spencer and A. J. Lewis, both of San Antonio, Tex., and Geo. C. Kemble, of Ft. Worth, Tex., for appellee.

Before BRYAN, FOSTER, and SIBLEY, Circuit Judges.

FOSTER, Circuit Judge.

Appellee, Mrs. Spencer, as beneficiary brought suit to recover on a policy of insurance issued in the sum of $25,000, on the life of her husband by appellant, together with 12 per cent. penalties and reasonable attorney's fees, allowed by the law of Texas for delay in payment. Appellant admitted issuing the policy and that all premiums had been paid, but incorporated in the answer an equitable defense as follows: That

the policy had lapsed on January 11, 1931, by default in payment of a note given for the premium due October 11, 1930; that thereafter the insured was guilty of fraud in executing a certificate of health for the purpose of reinstating the policy; that appellant did not know and had no means of obtaining knowledge of the false representations until it received the proof of death; that had it known of the condition of insured's health it would not have revived the policy. Appellant moved for the transfer of the case to the equity docket, for the purpose of disposing of the equitable plea. The District Court overruled the motion and declined to consider the plea. At the close of the evidence the court directed a verdict for the net amount of the policy, after deducting an unpaid loan, with 12 per cent. statutory damages, and left it to the jury to fix a reasonable attorney's fee. This resulted in a verdict for $28,195.79, for which judgment was entered. Error is assigned to the above set out rulings of the court.

Certain provisions of the policy may be somewhat briefly stated. The policy was issued on April 11, 1923, in the amount of $25,000, for an annual premium of $810.50, which the insured had the option of paying annually; semiannually in the sum of $421.50 or quarterly in the amount of $214.75. It was incontestable after one year except for nonpayment of premiums. It provided that the payment of a premium or any installment thereof should not maintain the policy in force beyond the date when the next premium was payable, and, if any premium should not be paid when due, the policy should cease and determine, unless otherwise expressly provided therein. A grace of thirty-one days was granted for the payment of every premium after the first, during which time the insurance was continued in force. It provided for a division of the surplus to be credited to the policy annually, with the option to the insured to receive it in cash or apply it towards the payment of any premium or to the purchase of paid-up, participating insurance, with the further provision that, unless the owner of the policy should elect otherwise in writing, the dividends would be held to the credit of the policy. If any premium was not paid at the expiration of the days of grace, the company should keep the policy in force by applying the accumulated dividends to the payment due on the policy, provided they were sufficient to pay a quarterly installment of the premium. The policy provided that it could be reinstated at any time after default of pre-

mium payment upon evidence satisfactory to the company of the insurability of the insured and payment of all premium arrears, with interest at the rate of 5 per cent. per annum. The policy provided:

"After premiums have been paid for two years from the date hereof (this Policy being then in force and provided there is no indebtedness against it), at the time any premium becomes due, or within the period of grace, or upon default in the payment of any premium when due, or within thirty-one days thereafter, the owner of this Policy may select any one of the options in the following table, and in the event that no such selection is made, the Company will continue this Policy in force as extended insurance, according to the first option, and all other options will be deemed waived; such extended insurance being non-participating and without loan or cash values. The values in the table apply only in the event there is no indebtedness against the Policy; but any such indebtedness may be paid in cash and the values in the table will then be applicable; or if not so paid, the cash and loan values will be reduced by the amount of indebtedness, and the amount of paid-up insurance will be reduced in the ratio of the indebtedness to the net value of such insurance, and the extended insurance shall be for such length of time only as the excess of the net value of extended insurance as shown in the table over the indebtedness, will purchase at the insured's attained age at the net single premium rate by the American Experience Table of Mortality and three per cent. interest. Dividend additions to the Policy, and additional premium payments for any fractional part of a year, if any, will increase the values in the table in proportion to the increase in the value of the reserve thereby."

The options in the table were (1) for extended insurance in years and days for the full amount of the policy; (2) upon legal surrender of the policy to receive a paid-up, participating policy for the amount set out in the table; and (3) to receive the cash surrender value or borrow the loan value, according to the number of years in force, which amounts were the same.

There is no dispute as to the material facts which are these. Under the above set out provision, the policy had a loan value of $2,812.25 after the premiums in full for seven years had been paid and $3,316.50 after the payment of premiums for eight years. On April 2, 1930, the insured executed a loan agreement and borrowed $2,812 on the pol-

icy. An existing loan was liquidated, premiums were paid on the policy up to April 11, 1930, and the insured received a check from the company for a balance of $366.65. Additional premiums were paid up to October 11, 1930. The premium due on that date was not paid. All dividends theretofore declared had been used in the payment of premiums. No additional dividend could be declared before the next anniversary of the policy, April 11, 1931. On October 17th, within the grace period, the insured wrote to the company requesting that it accept a note due in ninety days for $214.75, the quarterly premium then due. The company answered on October 22d, advised the insured that two months from the due date was the maximum extension that could be arranged for a single quarterly premium and inclosed two notes, maturing in three and four months from October 11, 1930, in the respective amounts of $211.50 and $210, to cover a semiannual premium due as of October 11, 1930, and suggested that he execute them. The insured agreed to this, executed the two notes and forwarded them to the company. Each note contained the statement that it was for a balance of the semiannual premium due October 11, 1930, and an agreement that it was not given or accepted as a payment of the premium and that the nonpayment of the note or any extension thereof at maturity would ipso facto lapse the policy and the company might charge the proportionate part of the note against any reserve value in the policy. The note due January 11th was not paid at maturity. Under the provisions of the policy and the terms of the note the policy then lapsed. Extended insurance available was not over eighty-five days. On January 21st, the company wrote the insured inclosing a certificate of health and informed him that it was necessary that it be executed in order that steps be taken to reinstate the policy and when completed it should be returned with a remittance of $214.67. Apparently the insured paid no attention to this letter and the company against wrote him on February 2d, suggesting that he pay the notes by means of an increase in the amount of his policy loan and inclosed a new loan agreement. The insured accepted this suggestion, executed the health certificate and negotiated a new loan on February 11, 1931, for $3,245.21, upon the pledge of the policy. Out of the surplus over the existing loan the semiannual premium then due was paid. Thereafter, the premiums were paid up to October 11, 1931. The insured died on September 12, 1931, a little more than seven

months after the reinstatement of the policy. In the health certificate, executed on February 4, 1931, the insured certified, inter alia, that he was then in good health and free from every ailment and complaint; that he had not had any injury, sickness, or ailments of any kind and had not consulted or been prescribed for by any physician or received medical treatment since the date of his original application, on which the policy was issued, except slight indispositions, colds, etc., and he renewed the statements and agreements contained in the original application. In the proof of claim, dated September 22, 1931, in the certificate of the attending physician, Dr. P. M. Waltrip, Jr., it was disclosed that the insured had died from chronic nephritis and that for approximately a year prior thereto he had been treated for chronic nephritis, hypertension, and chronic myocarditis by the said physician and by Dr. H. B. Trigg. Appellant declined to make settlement on the policy. This suit was filed on November 13, 1931. On February 3, 1932, appellant filed its answer and equitable plea for cancellation of the policy.

Relying mainly on the provision of the policy above set out, appellee contends: That at the time the premium became due on October 11, 1930, by the payment of the two preceding quarterly premiums, the policy had acquired a new loan value of $252.50, which the insured was entitled to borrow to pay the quarterly premium then due; that the note given for this quarterly premium was intended to be a loan and must be considered to have been a loan against the policy; that, if not, it was the duty of the company to apply this loan value to the payment of the note; that the note was entitled to a grace period of thirty-one days for its payment; that, therefore, the policy did not lapse and the company had no right to require the execution of a health certificate for its reinstatement; that, the giving of the health certificate was without consideration and immaterial.

█ The provisions of the policy regarding the payment of premiums and reinstatement are separate and distinct from the provisions as to loans and they are not to be confused in interpreting the policy. It is obvious that, if the company had the right to apply the loan value to the payment of premiums in advance, the right of the insured to obtain the full surrender value or the benefit of any of the other options would be impaired.

█ We are not dealing with the forfeiture of the policy for nonpayment of a loan. Upon the termination of the policy, either through voluntary surrender or lapse through failure to pay a premium, the option to take extended insurance would be automatically applied for his benefit, if the insured made no selection, but the exercise of any other option would require affirmative action on his part. The company had no power to exercise any of these options for the insured and was under no obligation to do so. It could not force him to take a loan and could not make the loan for his benefit unless he applied for it. Of course, after default on the premium note, the company had the right to apply any accumulations under the policy to its payment. But the premium was payable in advance and by executing the note the policy was kept in force for three months regardless of whether it was ever paid or there were any accumulations to liquidate it.

The insured permitted the policy to lapse for nonpayment of the premium note. Under the provisions of the policy the only duty of the company at that time was to apply unpaid dividends, if any, to the payment of the premium or give extended insurance. There were no dividends to apply to premiums and extended insurance would not have kept the policy in force to the date of death. Under the terms of the policy it could be reinstated only by giving satisfactory evidence of insurability at that time. It is fundamental in life insurance that only persons in sound health are insurable risks and the prompt payment of premiums is essential to keep the policy alive. The health certificate was therefore very material.

█ The rule is well settled that a policy of insurance if ambiguous is to be construed strongly against the company. It is equally well settled that the courts will not write a new contract for the parties to allow the beneficiary to recover at all events. Citation of authority is unnecessary as to this. When the provisions of the policy as to loans, on the one hand, and payment of premiums and reinstatement of the policy after it has lapsed, on the other, are separately considered and not confused, the policy is plain and unambiguous and requires no construction. There is no ground for assuming that the insured was deceived as to his rights. He was an attorney and actively engaged in the oil business. He had made numerous loans against the policy and has used these loans, at least in part, for the payment of premiums in advance. He had also applied all dividends declared to the payment of premiums. He was entitled to only thirty-one days' grace

for the payment of the premium due on October 11, 1930, under the terms of the policy, and he readily acquiesced in the agreement to give premium notes for a semiannual instead of a quarterly premium, which saved him a few dollars and gave him a grace of three months for the payment of one-half and of four months for the other half. It is not possible that he thought he was applying for a loan against the policy. The transaction that occurred was perfectly fair and equitable and clearly within the intention of the parties. If the allegations of the plea be taken for true, he was guilty of fraud in procuring the reinstatement of the policy. The insured arranged for the payment of a semiannual and not a quarterly premium. There was not enough loan value to pay a semiannual premium. To construe the premium notes as an application for a loan against the policy or to say that the policy demanded that the company apply the existing loan value to the payment of a quarterly premium would be to write a new contract for the parties.

The insured was not entitled to an additional thirty-one days' grace for the payment of the note. That grace had already been given in the execution of the note. Southland Life Insurance Co. v. Hopkins (Tex. Com. App.) 244 S. W. 989; Schmedding v. Northern Assur. Co., 170 Mich. 528, 136 N. W. 361; Holly v. Metropolitan Life Ins. Co., 105 N. Y. 437, 11 N. E. 507; Robnett v. Cotton States Life Ins. Co., 148 Ark. 199, 230 S. W. 257; Lefler v. N. Y. Life Ins. Co. (C. C. A.) 143 F. 814; Kansas City Life Ins. Co. v. Leedy, 62 Okl. 131, 162 P. 760, L. R. A. 1917C, 917; Dreeben v. Mut. Life Ins. Co. of N. Y. (C. C. A.) 29 F.(2d) 963.

The reinstatement of the policy was in effect a new contract and the contestable period began to run anew. The plea for cancellation was filed within that period. New York Life Ins. Co. v. Seymour (C. C. A.) 45 F.(2d) 47, 73 A. L. R. 1523; Mutual Life Ins. Co. v. Dreeben (D. C.) 20 F.(2d) 394; Great Western Life Ins. Co. v. Snavely (C. C. A.) 206 F. 20, 46 L. R. A. (N. S.) 1056; Teeter v. United Life Ins. Ass'n, 159 N. Y. 411, 54 N. E. 72; Pacific Mutual Life Ins. Co. v. Galbraith, 115 Tenn. 471, 91 S. W. 204, 112 Am. St. Rep. 862; State Mutual Life Ins. Co. v. Rosenberry (Tex. Com. App) 213 S. W. 242; Ash v. Fidelity Mut. Life Ass'n, 26 Tex. Civ. App. 501, 63 S. W. 944.

Considering the facts disclosed by the record, it was the duty of the District Court to try the equitable plea before permitting the case to go to the jury on the issues triable at law. Liberty Oil Co. v. Condon Nat. Bank, 260 U. S. 235, 43 S. Ct. 118, 67 L. Ed. 232. If the plea had been sustained by competent evidence, appellant would have been entitled to a cancellation of the policy, there was nothing for the jury to consider and a directed verdict in favor of appellant was in order. The assignments of error are well taken. The judgment appealed from is reversed, and the case remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.